UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| GREGORY LAWRENCE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 4:19-cv-00169-SNLJ |
| | ) |
| TVS SUPPLY CHAIN SOLUTIONS | ) |
| NORTH AMERICA, INC., et al. | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM AND ORDER

Currently before this Court is plaintiff's motion to remand (#12), which has been fully briefed. For the reasons set forth, this Court will **DENY** the motion.

## I.  BACKGROUND

The following facts are taken from plaintiff's complaint and the affidavit of Jill Chaney-Lipe, which was attached to TVS's notice of removal. *See Pudlowski v. The St. Louis Rams, LLC.,* 829 F.3d 963, 964 (8th Cir. 2016) (holding that "discovery is available to ascertain the facts bearing on [the] issue [of jurisdiction]," to include consideration of affidavits submitted in support of removal).

Plaintiff states that he has a "history of disability," which includes mycosis fungoides and post-traumatic stress disorder—the former of which requires "phototherapy sessions" to address lesions that can cause "severe itching, contact dermatitis, peeling, burning, and cracked skin." In the summer of 2016, plaintiff was hired by TVS as a materials analyst at its Wentzville, Missouri, facility, which "provides

1

supply chain services to the [nearby] General Motors [] Assembly Plant." For the first year-or-so of his employment, plaintiff's conditions appear to have had little consequence in the workplace.

On July 17, 2017, the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America and its Local Union 282 (the "Union") was certified by the NLRB as the sole bargaining agent for TVS's Wentzville facility. A few months later, on September 11, 2017, TVS notified the Union of General Motors' efforts to downsize production. This prompted TVS to reduce its own shifts from four to three. On September 22, 2017, TVS and the Union signed a "memorandum of agreement," which outlined the process of altering TVS's "manning levels and job schedules." Pursuant to that memorandum, there would be three available shifts—a first, second, and third corresponding with morning, afternoon, and overnight—that employees would have to choose form. The second and third shifts had a slight pay premium. Placement into any particular shift was to be based on seniority if there happened to be an insufficient number of openings. As a result of this procedure, plaintiff was initially place into second shift sometime around October 4, 2017—though he requested third shift as his top preference. As he explains it, plaintiff desired third shift because his phototherapy sessions were only available "during the daytime hours," because an overnight shift "reduce[s] the risk of exposure to sunlight, which exacerbate[s] his [condition]," and because an overnight shift would "reduce the risk of him having an episode of PTSD."

Plaintiff began inquiring about a possible workplace disability accommodation in late September or early October, 2017. He explains that TVS management only initially

seemed interested in granting him leave under the Family and Medical Leave Act (FMLA). However, plaintiff acknowledged that TVS management was actively discussing his situation with him and that, as of December 13, 2017, "Cigna notified [him] that [his] request for workplace accommodation was under review." During this process, plaintiff also complained of workplace sexual harassment by defendant Brand—one of plaintiff's supervisors. Plaintiff says he was then "retaliated against by Brand," which culminated in disciplinary action against plaintiff "for attendance." Plaintiff also tangentially suggests that he was retaliated against for his "requested workplace accommodation," though it is unclear from the complaint who plaintiff is referring to as the perpetrator of this particular category of retaliation. In any event, plaintiff filed a charge of discrimination with the Missouri Commission on Human Rights (MCHR) on January 17, 2018; he suggests he was retaliated against for this action, as well. A few days later, on January 21, 2018, plaintiff's request for third shift was granted "based on his seniority date and a recent opening within that shift which he had the seniority to fill."

Months later, on April 15, 2018, TVS executed a collective bargaining agreement with the Union. Among other provisions, the CBA contained "layoff and recall" language that required "the employee with the least amount of plant seniority [to] be laid off" should permanent downsizing be deemed necessary. In May 2018, General Motors announced "that some of the job functions currently performed by materials analysts were being removed from TVS." This prompted TVS to eliminate ten materials analysts positions. According to TVS, plaintiff was selected for layoff in accordance with Article 17, Section 3a—based on his date of seniority—that was to take effect on June 30, 2018.

Plaintiff alleges TVS ultimately terminated him in response to his "protected activities," including his request for a workplace accommodation, his filing of a charge of discrimination, and his participation in an investigation involving sexual harassment by defendant Brand. However, plaintiff does not refute that he was eventually recalled on October 29, 2018, pursuant to Article 17, Section 3c, which states "employees will be recalled from layoff in reverse order of layoff, provided they are capable of performing the tasks of the open positions." On November 5, 2018, plaintiff returned to work as a materials analyst on third shift.

Plaintiff initially filed his lawsuit in the Circuit Court of St. Charles County, Missouri, on December 21, 2018. His complaint alleged three counts under the Missouri Human Rights Act (MHRA). TVS then removed the case to this Court pursuant to 28 U.S.C. §§ 1331 and 1441(a) on the grounds that plaintiff's state-law claims are preempted by Section 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185. TVS contends that plaintiff's claims are "inextricable intertwined with the memorandum of agreement and collective bargaining agreement" such that preemption is unavoidable. Plaintiff opposes the motion, arguing his claims are not preempted because they require "no interpretation of any specific CBA provision, and instead [can] be resolved by looking at the conduct of plaintiff and the conduct and alleged motivations of defendant" without regard to the CBA.

## II.  ANALYSIS

This case comes to the Court under federal question jurisdiction. Ordinarily, the well-pleaded complaint rule would require the Court to narrowly consult "plaintiff's

4

statement of his own claim … unaided by anything alleged in anticipation of avoidance of defenses which it is thought the defendant may interpose." *Aetna Health, Inc. v. Davila*, 542 U.S. 200, 207 (2004) (quoting *Taylor v. Anderson*, 234 U.S. 74, 75-76 (1914)). Simply put, "the existence of a federal defense normally does not create statutory 'arising under' jurisdiction." *Id*. There is an exception, however, under the "complete preemption" doctrine, which holds that "when [a] federal statute completely preempts the state-law cause of action, a claim which comes within the scope of that cause of action, even if pleaded in terms of state law, is in reality based on federal law." *Id*. at 207-208. Thus, complete preemption can totally supplant a state law claim and make removal appropriate under federal question jurisdiction. *See Vaden v. Discover Bank*, 556 U.S. 49, 61 (2009). To the extent it applies, the LMRA has the power of complete preemption. *See Markham v. Wertin*, 861 F.3d 748, 754-755 (8th Cir. 2017); *Schuver v. MidAmerican Energy Co*., 154 F.3d 795, 798 (8th Cir. 1998).

> Section 301 of the LMRA provides:
>
> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a). Long ago, the Supreme Court noted this language carries more than jurisdictional power and, in fact, "authorizes federal courts to fashion a body of federal law for the enforcement of these collective bargaining agreements." *Textile Workers Union of Am v. Lincoln Mills of Ala*., 353 U.S. 448, 451 (1957). It has gone on to explain

5

that Section 301 thereby establishes two categories of claims falling within the ambit of its preemptive powers: (1) "claims founded directly on rights created by collective-bargaining agreements"; and (2) "claims substantially dependent on analysis of a collective-bargaining agreement." *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 394 (1987). In this case, plaintiff argues his claims arise independently of the labor agreements, while defendants argue the claims are dependent on those agreements—essentially, the parties dispute the applicability of the second *Caterpillar* category.

To resolve that dispute, this Court must decide whether "evaluation of the [statutory] claim[s are] *inextricably intertwined* with consideration of the terms of the labor contract[s]. If the state [] law purports to define the meaning of the contract relationship, that law is preempted." *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 213 (1985) (emphasis added). But, "even though [the court's] task is to identify whether federal jurisdiction exists"—as a matter of preemption—"state law does not take a backseat in the analysis." *Boldt v. Northern States Power Co*., 904 F.3d 586, 590 (8th Cir. 2018). To be sure, "[t]he proper starting point for determining whether interpretation of a collective-bargaining agreement is required is an examination of the state-law claim itself." *Id*. The Court, therefore, turns to an analysis of each of plaintiff's state-law claims.

### A. Applicability of LMRA Preemption to Plaintiff's Failure to Accommodate and Wrongful Discharge Claims Under the Missouri Human Rights Act

Counts I and II of the complaint assert failure-to-accommodate and wrongful discharge claims under the MHRA.[1] § 213.055, RSMo. Subsection 213.055.1(1)(a) makes it unlawful for any entity

> To fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, national origin, sex, ancestry, age or disability.

*Id*. To the extent these two counts allege different facts, both are merely different ways of proving the same claim for discrimination under the MHRA based on disability. Indeed, "the MHRA does not provide for 'types' of [disability] discrimination claims; a claim is either a claim of [disability] discrimination or it is not." *See R.M.A. by Appleberry v. Blue Springs R-IV School Dist*., 568 S.W.3d 420, 426 n.4 (Mo. banc. 2019).

In August 2017—before the facts of this case arose—the MHRA was amended to clarify the causation standard that applies to discrimination claims. Under the amended MHRA, a plaintiff bears the burden of proving the adverse action "was made or taken *because of* his or her protected classification and was the direct proximate cause of the claimed damages." § 213.111.5, RSMo. (2017) (emphasis added). The term "because of" as "it relates to the adverse decision or action" means that the "protected criterion was *the motivating factor*." § 213.010(2), RSMo. (2017) (emphasis added).

---

[1] In view of the fact that the accommodation was eventually granted, this Court assumes the failure-to-accommodate claim is based solely on the delay between plaintiff's initial request for accommodation and the date in which it was granted.

7

This exacting causational requirement makes it impossible for this case to avoid intertwinement with the labor agreements in this case. As noted, plaintiff does not refute the underlying fact that TVS reduced its workforce—necessitating shift reassignments and layoffs based on seniority—in response to General Motors' own reorganization efforts. More specifically, the adverse actions taken against plaintiff were not in isolation, but came about as part of a larger organized reduction in force controlled by the "layoff and recall" provisions of the collective bargaining agreement and its antecedent memorandum of understanding.[2] In fact, plaintiff was also eventually *rehired* under these same provisions. Accordingly, plaintiff simply cannot set out to prove that the adverse actions taken against him were "because of" his disability without a concomitant determination of the applicability of the labor agreements. *See Davis v. Johnson Controls, Inc*., 21 F.3d 866 (8th Cir. 1994) (LMRA preempted claim under MHRA for failure to accommodate disability that required examination of seniority rights of other employees under a CBA); *see also Fant v. New England Power Serv. Co*., 239 F.3d 8, 15 (1st Cir. 2001) ("A state law claim may depend upon the meaning of the CBA if the conduct at issue constitutes a breach of duty under the CBA or resolution of the dispute hinges upon interpretation of the CBA.").

B. **Applicability of LMRA Preemption to Plaintiff's Retaliation Claim**

---

[2] A memorandum of agreement can be subject to Section 301(a) of the LMRA, which governs "contracts between an employer and a labor organization representing employees[.]" 29 U.S.C. §185(a); *see also Senior v. NSTAR Elec. and Gas Corp*., 449 F.3d 206, 207-208 (1st Cir. 2006) (holding that early retirement program memorialized in two memoranda of agreement was enforceable under Section 301 of the LMRA).

Finally, there is the retaliation claim under count III. That claim arises under Section 213.070(2), which "requires the employee to show that (1) [he] complained of discrimination; (2) the employer took adverse action against [him]; and (3) the adverse action was causally linked to the discrimination complaint." *Medley v. Valentine Radford Communications, Inc.*, 173 S.W.3d 315, 325 (Mo. App. W.D. 2005); *see also Markham v. Wertin*, 861 F.3d 748 (8th Cir. 2017) (applying *Medley's* three-factor test to Section 213.070). Here, plaintiff argues that he "complain[ed] of discrimination in the workplace to human resources" about defendant Brand's sexual-harassment-related conduct and retaliatory write-ups regarding plaintiff's attendance. These complaints, plaintiff says, led to a delay in the granting of his accommodation, his eventual discharge, and a host of hostile-work-environment type actions by unnamed third parties.

The delayed accommodation and discharge issues, as "adverse actions" under the third element, are tied to the above analysis on counts I and II. Adding the gloss of a retaliation claim to them makes no difference, because Missouri law still requires plaintiff to show his complaints of discrimination were a "motivating factor" to those results. *See* §§ 213.010(2), 213.111.5, RSMo. (2017). Again, whether TVS could take either of those actions, either as plain discrimination or in retaliation to plaintiff's protected complaints, requires entanglement with the labor agreements that restrict TVS's ability to exercise discretion in taking those actions for purposes of establishing retaliatory motive sufficient to satisfy Missouri's causation standards.

That leaves the allegation that plaintiff's protected complaints led to a hostile work environment. Missouri law protects against this category of retaliation, either in the sense

9

of a supervisor's tangible adverse employment action or in the sense of diffuse workplace hostilities by non-supervisory employees that an employer simply permits to continue. *See Diaz v. Autozoners, LLC*., 484 S.W.3d 64, 76 (Mo. App. W.D. 2015). As such, this category need not produce a conventional (or "tangible") adverse employment action like termination or an unfavorable change in workplace conditions; but instead, because the MHRA broadly covers "*any damages* due to an act of reprisal," plaintiff could conceivably recover damages for his emotional distress, humiliation, and suffering that resulted from a hostile work environment. *Mignone v. Missouri Dept. of Corrections*, 546 S.W.3d 23, 36 (Mo. App. W.D. 2018). Among other things, plaintiff seeks exactly that: damages for his "emotional pain, suffering, humiliation, fear, anxiety, dread, inconvenience, mental anguish, embarrassment, [and] loss of enjoyment of life." TVS makes no argument why these particular damages would implicate the labor agreements. Indeed, these agreements would seem to have no application, or at best would be only tangentially relevant. Therefore, this Court finds plaintiff's retaliation claim, to the extent it seeks damages having nothing to do with issues of transfer or discharge, is not preempted by the LMRA. The Court will exercise supplemental jurisdiction over plaintiff's retaliation claim because it is "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a).

### III. CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that plaintiff's motion to remand (#12) is **DENIED**.

So ordered this 25th day of July 2019.

                                               _____
                                               STEPHEN N. LIMBAUGH, JR.
                                               UNITED STATES DISTRICT JUDGE